# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ALLIED FUELS† and JAMES HASTY,<br><br>Appellants,<br><br>v.<br><br>STATE OF WASHINGTON, Department of Enterprise Services; and RENEWABLE ENERGY GROUP, an Iowa corporation,<br><br>Respondents. | DIVISION ONE<br><br>No. 82494-5-I<br><br>UNPUBLISHED OPINION |

DWYER, J. — Allied Fuels and James Hasty (collectively Allied Fuels) appeal from the trial court's orders granting summary judgment to Renewable Energy Group (REG) and the Washington State Department of Enterprise Services (the Department). Allied Fuels asserts that the trial court erred by dismissing various claims on summary judgment. Additionally, Allied Fuels contends that the trial court erred by denying, in part, a motion wherein Allied Fuels sought to amend its first amended complaint to advance a claim of negligent misrepresentation against the Department. Because Allied Fuels fails to establish an entitlement to relief on any of these claims, we affirm.

I

In December 2017, the Department issued a request for proposal, denominated as RFP 01817, for a contract related to fuel supply. Under this

---

† The record indicates that the correct name of the appellant is Allied Fuel, LLC. For reasons unexplained in its briefing, appellant refers to itself as Allied Fuels. Throughout this opinion, we refer to the party in the same manner that it has referred to itself.

request for proposal, the Department sought to contract with a single fuel refinery, which would, in turn, subcontract with fuel distributors. The request also required any refinery submitting a proposal to submit an "inclusion plan." Under this inclusion plan, the refinery was required to identify small and minority owned businesses that would perform as subcontractors for the project.

In May 2017, before the Department issued its request for proposal, two employees of the Department contacted James Hasty to organize a meeting with him. Hasty, who is Black, owned a fuel distribution company, Allied Fuels. That same month, Hasty met with three employees of the Department to discuss the request for proposal that the Department planned to issue. These employees encouraged Hasty to reach out to REG to "establish a relationship."

In January 2018, Hasty approached REG to discuss the Department's request for proposal. Hasty informed Todd Ellis, REG's director of regional sales, that Allied Fuels was designated as a minority business enterprise in Washington and also provided fuel distribution and delivery services.

Thereafter, Allied Fuels and REG engaged in a series of negotiations regarding Allied Fuels' potential role as a subcontractor to REG in the event that REG was awarded a master contract from the Department.

On January 18, 2018, Hasty sent a document to Ellis that was entitled "Re: Joint Venture proposal – Washington Enterprise Service Fuel Contract." This document stated: "Allied Fuel LLC ('Allied') is pleased to submit this proposal for services to strengthen Renewable Energy Group's ('REG') execution of the WA DES Fuel Contract in the event REG is awarded the Master Contract."

2

The document outlined 13 services that Allied Fuels was willing to provide in the event that REG was awarded the master contract. Allied Fuels did not state that it would provide fuel distribution services. In exchange for providing the services contained within this proposal, Allied Fuels requested that it receive "forty cents ($0.40) per gallon for total delivered annual gallons with payment terms to be determined in the event of award for WA DES RFP."

That same day, REG submitted a bid to the Department for the master contract. In its bid submission, REG listed Allied Fuels as both a fuel distributor and a certified diverse subcontractor with whom REG intended to work. REG described the nature of the services that it anticipated to be provided by Allied Fuels as "[s]upply, transportation, tank monitoring, [and] emergency planning." REG also represented that the "[a]nticipated percent of total contract amount" allocated to Allied Fuels would be 5 percent.

Five days later, Ellis responded to Allied Fuels' proposal via an e-mail message. In this communication, Ellis identified various "key terms" that Allied Fuels would need to agree to in order "to progress further." With regard to these terms, Ellis also stated that "REG is pleased to provide the following non-binding terms to progress our conversations forward."

That same day, Hasty replied to Ellis's e-mail message. Therein, Hasty identified three proposed terms to which he did not agree. The following emphasized language is text that was added by Hasty in response to Ellis's proposed terms:

> (1) "REG is proposing .07–.10 a gallon for services performed by Allied Fuels. *Not agreeable. Allied will agree to .30 cpg on all*

3

> *products awarded along with a 30% guarantee of the total*
> *Diverse Business annual spend amount.*"
>
> (2) "If awarded [the] contract, REG reserves the right to further
> negotiate final service fee w[ith] Allied Fuels. *Not Agreeable.*
> This will be based on Allied's provided service capabilities and
> business planning. *All work determined by the initial agreement*
> *will be final and any additional work can be negotiated.*"
>
> (3) "Due to the lack of information regarding details of the support
> services and proposed partners, REG may select at its
> discretion which services and partners Allied Fuels will support
> for the Fuel Contract. *Pursuant to Allied's most recent written*
> *proposal dated January 18, 2018 at 10:44am (please see*
> *attached), these are the services Allied will provide.*"

(Emphasis added.)

On January 29, 2018, Ellis sent Hasty an e-mail message containing revised proposed terms, which were essentially the same as the terms that Ellis proposed to Hasty on January 23. The only difference was the language used to describe the second proposed term that Hasty did not agree to on January 23. In Ellis's January 29 e-mail message, this second proposed term read: "Based on Allied's proposed service capabilities and business planning REG and Allied will finalize total service fees." In a response to Ellis's January 29 e-mail, Hasty did not agree to the same three terms with which he had previously disagreed.

Also on January 29, Ellis sent Hasty a text message, which stated: "James thank you for the feedback. We will not be able to meet you at that price point. We appreciate the opportunity and look forward to finding ways to work together in the future." On January 30, Hasty replied by text message that, "We'll accept your offer of 10 cpg." That same day, Ellis responded, "Thanks James. I will call soon. Tied up in a meeting."

4

On January 31, 2018, Ellis sent Hasty a text message, which stated: "We need to go ahead and submit." Ellis sent another text message, which read: "Reminder to send tax id." That same day, Hasty sent an e-mail message that contained Allied Fuels' tax identification number:

> Per our discussion, here's our TIN (27-0809315) and is intended for the use of [REG]'s initial bid submittal on the WA DES RFP in the event Allied and REG do not reach an agreement All[ied] reserves the right to withdraw that from our REG's [sic] proposal.

REG and Allied Fuels, however, never entered into a signed written agreement outlining all of the terms that the parties would be subject to in the event that REG was awarded the master contract with the Department.

On February 12, 2018, the Department announced REG as the apparent successful bidder on the request for proposal. However, after REG was announced as the apparent successful bidder, the Department informed REG that it needed to reduce its costs. The Department and REG had received feedback from potential fuel purchasers that the projected costs of fuel were too high under REG's proposal in comparison to the costs that these purchasers were paying at the time.

On March 21, 2018, Ellis met with Hasty and informed him that the Department had requested that REG reduce its costs. In turn, Ellis informed Hasty that REG intended to renegotiate the "[a]nticipated percent of total contract amount" to be assigned to Allied Fuels to an amount that was less than 5 percent.

Hasty subsequently scheduled a meeting with Chris Liu, the director of the Department, and Debra Entenman. At the time, Entenman served as an aide to

5

a member of Congress. At the meeting, Hasty expressed displeasure with the fact that Ellis had approached Hasty about reducing the percentage that Allied Fuels was to receive under the master contract. In a deposition, Hasty testified that Director Liu responded to Hasty by stating, "Well, you know, based on the size of your company, you know, you really should just be happy with 1 percent." According to a declaration of Hasty, he "took this comment as a direct racial comment given that Allied at least at the time was the only fuel distribution company owned by a Black man in the entire State of Washington."

Ultimately, REG did not enter into a master contract with the Department. Indeed, in September 2018, the Department "provided public notice that it was cancelling the procurement." Thereafter, the Department did "not enter[] into a new contract with any other contractor on a similar project."

In January 2020, Allied Fuels and Hasty filed a complaint against REG and the Department in the King County Superior Court. This complaint alleged various causes of action, including: (1) a claim of breach of contract alleged against REG, (2) a claim of negligent misrepresentation alleged against REG, (3) a claim of negligent misrepresentation alleged against the Department, (4) a claim advanced pursuant to the Washington law against discrimination (the WLAD)[1] alleged against REG, and (5) a claim advanced pursuant to the WLAD alleged against the Department.[2]

---

[1] Ch. 49.60 RCW.
[2] In addition to these claims, the complaint alleged that both REG and the Department (1) engaged in third party contract interference, (2) violated the Consumer Protection Act, chapter 19.86 RCW, (3) engaged in blacklisting in violation of the WLAD, (4) engaged in fraud, and (5) engaged in tortious interference with a business relationship.

On April 16, 2020, the Department filed a motion to dismiss all of the claims that were alleged against the Department. On April 28, REG filed a motion to dismiss all of the claims alleged against REG.

On May 19, 2020, Allied Fuels filed a motion to amend the complaint. In this motion, Allied Fuels sought to amend several sentences of the complaint, which included the removal of REG from its claim of tortious interference with a business relationship. The trial court granted this motion.

On June 2, 2020, the trial court granted in part and denied in part the Department's motion to dismiss. In this order, the trial court dismissed with prejudice the following claims that were alleged against the Department: (1) third party contract interference, (2) violation of the Consumer Protection Act, and (3) blacklisting in violation of WLAD. The trial court also dismissed without prejudice the fraud and negligent misrepresentation claims that were filed against the Department.

That same day, the trial court also granted in part and denied in part REG's motion to dismiss. In this order, the trial court dismissed with prejudice the following claims that were alleged against REG: (1) third party contract interference, (2) violation of the Consumer Protection Act, (3) blacklisting in violation of WLAD, and (4) tortious interference with a business contract. The trial court also dismissed without prejudice the claim of fraud against REG.

On February 4, 2021, both REG and the Department filed motions for summary judgment. In REG's motion, REG sought summary judgment dismissal

of the breach of contract, negligent misrepresentation, and WLAD claims.[3]  In the Department's motion, the Department sought summary judgment dismissal of the tortious interference with a business relationship and WLAD claims.

On February 17, 2021, Allied Fuels filed a motion in which it sought to "reinstate" the negligent misrepresentation claim against the Department.  A copy of a proposed second amended complaint was not attached to this motion.  On March 3, the trial court denied this motion.[4]

On March 4, 2021, the trial court entertained both of the summary judgment motions.  Also on March 4, Allied Fuels filed a motion to amend the first amended complaint.  In this motion, Allied Fuels sought to amend the first amended complaint to plead a claim of negligent misrepresentation against the Department.  Allied Fuels also sought to "modif[y] the name of Renewable Energy Group to concur with its current name of REG Marketing & Logistics Group, LLC."

That same day, the trial court entered an order granting REG's motion for summary judgment insofar as it sought to dismiss the remaining claims that

---

[3] REG also sought a grant of summary judgment on two counterclaims that were advanced by REG against Allied Fuels.  First, REG alleged that Hasty violated the Washington privacy act, chapter 9.73 RCW, by recording conversations without consent.  Second, REG alleged that Hasty engaged in malicious prosecution with regard to his blacklisting claim advanced pursuant to the WLAD.

[4] In so doing, the trial court reasoned:
This motion should properly have been brought pursuant to CR 15.  Contrary to Plaintiff's assertions, the motion does not simply revive a prior dismissed claim as set forth in the Amended Complaint.  Rather, it seeks to introduce new factual bases for such claim.  Defendant State of Washington is entitled to notice of the factual underpinnings of Plaintiff's allegations before assessing their validity.

Allied Fuels had alleged against REG.[5]  The trial court also entered an order granting the Department's motion for summary judgment.

On April 21, 2021, the trial court denied Allied Fuels' motion to amend insofar as it sought to amend the first amended complaint to plead a claim of negligent misrepresentation against the Department.[6]

Allied Fuels appeals.

II

Allied Fuels asserts that a genuine issue of material fact exists as to whether REG breached a contract with Allied Fuels.  Because no contract existed between Allied Fuels and REG, we disagree.

We review an order granting summary judgment de novo, performing the same inquiry as the trial court.  Nichols v. Peterson Nw., Inc., 197 Wn. App. 491, 498, 389 P.3d 617 (2016).  In so doing, we draw "all inferences in favor of the nonmoving party." U.S. Oil & Ref. Co. v. Lee & Eastes Tank Lines, Inc., 104 Wn. App. 823, 830, 16 P.3d 1278 (2001).  Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c).

"Washington follows the objective manifestation test for contracts." Keystone Land & Dev. Co. v. Xerox Corp., 152 Wn.2d 171, 177, 94

---

[5] The trial court's order denied the motion for summary judgment insofar as it sought summary judgment determinations that Hasty (1) violated the Washington privacy act by recording conversations without consent, and (2) engaged in malicious prosecution with regard to his blacklisting claim advanced pursuant to the WLAD.

[6] The trial court's order granted the motion to amend insofar as it sought to modify REG's name as it appeared in the first amended complaint.

9

P.3d 945 (2004) (citing Wilson Court Ltd. P'ship v. Tony Maroni's, Inc., 134 Wn.2d 692, 699, 952 P.2d 590 (1998)). Contract formation requires an objective manifestation of mutual assent of both parties. Id. at 177-78 (citing Yakima County (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima, 122 Wn.2d 371, 388, 858 P.2d 245 (1993)). "Moreover, the terms assented to must be sufficiently definite." Id. at 178 (citing Sandeman v. Sayres, 50 Wn.2d 539, 541, 314 P.2d 428 (1957)). Mutual assent to definite terms is normally a question of fact for the fact finder. Id. at 178 n.10 (citing Sea-Van Invs. Assocs. v. Hamilton, 125 Wn.2d 120, 126, 881 P.2d 1035 (1994)). But a question of fact may be determined as a matter of law if reasonable minds could not differ. Hartley v. State, 103 Wn.2d 768, 775, 698 P.2d 77 (1985) (citing LaPlante v. State, 85 Wn.2d 154, 531 P.2d 299 (1975); Balise v. Underwood, 62 Wn.2d 195, 381 P.2d 966 (1963)).

P.E. Sys., LLC v. CPI Corp., 176 Wn.2d 198, 207, 289 P.3d 638 (2012).

Furthermore, "[a] valid contract requires the parties to objectively manifest their mutual assent to *all* material terms of the agreement." P.E. Sys., LLC, 176 Wn.2d at 209 (emphasis added).

Allied Fuels contends that a contract was formed between Allied Fuels and REG through a series of conversations that occurred in January and February 2018. In particular, on January 18, 2018, Hasty sent a document to Ellis that was entitled "Re: Joint Venture proposal – Washington Enterprise Service Fuel Contract." Notably, this document stated: "Allied Fuel LLC ('Allied') is pleased to submit this proposal for services to strengthen Renewable Energy Group's ('REG') execution of the WA DES Fuel Contract *in the event REG is awarded the Master Contract.*" (Emphasis added.) The document also outlined 13 services that Allied Fuels was willing to provide in the event that REG was awarded the master contract:

- Supply Management - Facilitate and coordinate purchase of Fuel Types from various facilities, using partnerships with multiple refineries and terminals.
- Carrier Management - Provide Carrier solutions to deliver fuel, in both above and below ground tanks
- Dispatch – Manage Delivery Schedules
- Tank Monitoring – Setup and provide as needed at each location
- Customer Ordering – Provide Secure Website Portal and 24/7 availability
- Purchase Order System – Create System as required by WA DES Contract and tie to Master Contract
- Create on-line Fuel Catalogue of available fuels per WA DES Contract
- Serve as Emergency Contact 24/7; provide 24/7 operational communications
- Provide Quarterly/Annual Sales reports to Enterprise Services as specified in Contract
- Provide Sales Report to Enterprise Services in support of Vendor Management Fee
- Implement Community Engagement Program with Diverse Businesses
- Create Internship Program
- Assist with Monitoring Sample Program and Storage

In exchange for providing these services, Allied Fuels proposed that it receive "forty cents ($0.40) per gallon for total delivered annual gallons with payment terms to be determined in the event of award for WA DES RFP."

In the sentence preceding the list of services that Allied Fuels was willing to provide, the document stated: "*Upon award of the Contract*, the Company which secures the Contract must provide supply, delivery, dispatch and invoicing services.  As a *sub-contractor* for REG, Allied Fuel will assume the following responsibilities."  (Emphasis added.)  A notable legal dictionary defines "subcontractor" as:

> Someone who is awarded *a portion of an existing contract* by a contractor, esp. a general contractor.  For example, a contractor who builds houses typically retains subcontractors to perform

11

specialty work such as installing plumbing, laying carpet, making cabinetry, and landscaping — each subcontractor is paid a somewhat lesser sum than the contractor receives for the work.

BLACK'S LAW DICTIONARY 1722 (11th ed. 2019) (emphasis added).

Similarly, "subcontract" is defined as "[a] *secondary* contract made by a party to the *primary* contract for carrying out the *primary* contract, or a part of it." BLACK'S, supra, at 410 (emphasis added).

Thus, the terms contained within the proposal sent by Hasty to Ellis were plainly contingent upon REG being awarded the master contract from the Department.

On January 23, 2018, Ellis responded to Allied Fuels' proposal via an e-mail message. In this e-mail response, Ellis stated that "REG is pleased to provide the following *non-binding* terms to progress our conversations forward." (Emphasis added.) This response also stated:

REG has communicated to Allied the challenges of integrating the proposed services between our respective companies and WA DES. *A more thorough and complete review and analysis must be conducted to assure successful implementation. If awarded [the] contract, REG and Allied will work [with] WA DES to further define supply, delivery, invoicing, and dispatching services as outlined in your letter.*

(Emphasis added.)

This language reemphasizes the fact that the terms that were being negotiated between Allied Fuels and REG were contingent upon REG being awarded the master contract. Moreover, this language demonstrates that the proposed terms were also subject to change even if REG was awarded the master contract.

12

The proposed terms in Ellis's e-mail message to Hasty, which were identified as "key terms," were as follows:

> As discussed today, here are the key terms needed to progress further:
> -REG reserves the right to work with additional small, diverse, veteran, and women owned businesses.
> -REG reserves the right to work with additional partners as needed to cover supply and transportation needs throughout the State in order to meet requirements of the contract.
> -REG is proposing .07-.10 a gallon for services performed by Allied Fuels.
> -If awarded [the] contract, REG reserves the right to further negotiate final service fee w[ith] Allied Fuels. This will be based on Allied's provided service capabilities and business planning.
> -Due to lack of information regarding details of the support services and proposed partners, REG may select at its discretion which services and partners Allied Fuels will support for the Fuel Contract.
> -Allied will provide REG with disclosure of systems, partners, IT and other services provide[d] REG is awarded [the] contract.

In Hasty's reply e-mail message, Hasty identified three proposed terms to which he did not agree:

> (1) "REG is proposing .07–.10 a gallon for services performed by Allied Fuels. *Not agreeable. Allied will agree to .30 cpg on all products awarded along with a 30% guarantee of the total Diverse Business annual spend amount.*"
> (2) "If awarded [the] contract, REG reserves the right to further negotiate final service fee w[ith] Allied Fuels. *Not Agreeable.* This will be based on Allied's provided service capabilities and business planning. *All work determined by the initial agreement will be final and any additional work can be negotiated.*"
> (3) "Due to the lack of information regarding details of the support services and proposed partners, REG may select at its discretion which services and partners Allied Fuels will support for the Fuel Contract. *Pursuant to Allied's most recent written proposal dated January 18, 2018 at 10:44am (please see attached), these are the services Allied will provide.*"[7]

---

[7] Allied Fuels asserts that the only term that was not agreed to by REG in Ellis's January 23, 2018 response was "the proposal that Allied be paid .07–.10 [cents] per gallon for services performed." Br. of Appellant at 11. According to Allied Fuels, the term regarding pricing was agreed to by Ellis in a text message exchange that occurred between Ellis and Hasty on February 7, 2018. However, viewed in the light most favorable to Allied Fuels, the text messages cited by

(Emphasis added.)

In a deposition, Hasty testified concerning Ellis's January 23, 2018 counter-proposal to Hasty:

> Q.   Right. There's no agreement on all of the terms proposed by Mr. Ellis in this e-mail, is there?
> A.   No.

On January 29, 2018, Ellis sent an e-mail message containing revised proposed terms, which were essentially the same as the terms that Ellis proposed to Hasty on January 23.  The only difference was the language used to describe the second proposed term that Hasty did not agree to on January 23.  In particular, this revision of the second proposed term read: "Based on Allied's proposed service capabilities and business planning REG and Allied will finalize total service fees."  In response to Ellis's revised proposed terms, Hasty did not agree to the same three terms that he had previously refused to agree to.  Indeed, during a deposition, Hasty testified that he and Ellis "essentially had agreed on the fee and everything else . . . that was not addressed within an 'agreed' was still in the process of negotiating."

Notably, Hasty also testified that, following these negotiations, he never received a signed written agreement from REG:

> Q.   Did you ever receive a signed written agreement from REG . . . with binding final subcontract terms?
> A.   No, I did not.

---

Allied Fuels indicate that the parties reached a tentative agreement on pricing on January 30, 2018—not February 7.  In particular, on January 30, Hasty sent a text message to Ellis that stated, "We'll accept your offer of 10 [cents per gallon]."  That same day, Ellis responded, "Thanks James.  I will call soon.  Tied up in a meeting."  In any event, the record contains no indication that Allied Fuels and REG reached any agreement on the other two terms that Hasty declined to agree to.

14

Consistent with Hasty's deposition testimony, Allied Fuels' chief financial officer, Judy Egger, testified in a deposition that "we didn't have an REG contract."

On this record, for two separate reasons, it is apparent that a contract was not formed between Allied Fuels and REG. First, REG was not awarded the master contract by the Department. Indeed, according to a declaration of an employee of the Department, the Department "announced [REG] as the *apparent* successful bidder" to the master contract in February 2018. (Emphasis added.) However, in September 2018, the Department "provided public notice that it was cancelling the procurement." Thereafter, the Department did "not enter[] into a new contract with any other contractor on a similar project." As already explained, any agreement between Allied Fuels and REG was explicitly contingent upon REG being awarded the master contract. Because REG was not awarded the master contract, no subcontract existed between Allied Fuels and REG.

Second, the record contains no indication that there was mutual assent to *all* of the material terms that were negotiated between Allied Fuels and REG. See P.E. Sys., LLC, 176 Wn.2d at 209. In response to Ellis's January 23, 2018 e-mail message in which Ellis provided the "key terms needed to progress further," Hasty stated that he did not agree to three of these "key" terms. Viewed in the light most favorable to Allied Fuels, a text message exchange between Hasty and Ellis indicates that both Hasty and Ellis reached a tentative agreement concerning the amount that Allied Fuels would be compensated under a

subcontract. However, there is no indication that Hasty and Ellis reached any agreement with regard to the other two "key terms" to which Hasty did not agree.

In fact, during a deposition, Hasty testified that he "essentially had agreed on the fee and everything else . . . that was not addressed within an 'agreed' was still in the process of negotiating." Indeed, the record is devoid of any indication that Hasty and Ellis reached an agreement with regard to the following term: "Based on Allied's proposed service capabilities and business planning REG and Allied will finalize total service fees." According to Allied Fuels, "this was the same issue as the [cents per gallon] to be paid to Allied."[8] However, this term was not the same as any initial agreement regarding compensation. Contrary to any initial agreement that was reached between Ellis and Hasty with regard to the amount that Allied Fuels would be compensated, this proposed term would have authorized REG and Allied Fuels to finalize total service fees at some undefined future time.

Additionally, there is no indication in the record that Hasty and Ellis reached an agreement concerning the following term: "Due to the lack of information regarding details of the support services and proposed partners, REG may select at its discretion which services and partners Allied Fuels will support for the Fuel Contract." According to Allied Fuels, "Hasty testified this was not a material term to him."[9] However, "[a] valid contract requires the *parties* to *objectively* manifest *their* mutual assent to all material terms of the agreement." P.E. Sys., LLC, 176 Wn.2d at 209 (emphasis added). It is of no consequence

---

[8] Reply Br. of Appellant at 2.
[9] Reply Br. of Appellant at 2.

that Hasty did not subjectively believe this term to be material. Ellis's e-mail message plainly states that this term was a "key term" to REG. Because Hasty did not assent to this term, there was no mutual assent to all of the material terms of the agreement.[10]

Because no contract existed between Allied Fuels and REG, Allied Fuels fails to establish a genuine issue of material fact as to whether REG breached any contract. Accordingly, the trial court did not err by granting REG's motion for summary judgment with regard to Allied Fuels' breach of contract claim.

III

Allied Fuels next contends that a genuine issue of material fact exists with regard to its negligent misrepresentation claim against REG. Allied Fuels asserts that REG provided two forms of false information to Allied Fuels that support a claim of negligent misrepresentation. We disagree.

The elements of negligent misrepresentation are:

(1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4)

---

[10] Allied Fuels also asserts that a contract existed between Allied Fuels and REG pursuant to the doctrine of part performance of oral contracts. However, "[t]he first requirement of the doctrine of part performance of oral contracts is that the contract must be proved by clear, cogent, and convincing evidence." In re Marriage of DewBerry, 115 Wn. App. 351, 361, 62 P.3d 525 (2003). As already explained, Allied Fuels fails to establish a genuine issue of material fact as to whether a contract existed between Allied Fuels and REG. In any event, Allied Fuels contends that it partially performed pursuant to an oral contract with REG by providing a tax identification number to REG. However, in providing this tax identification number to Ellis, Hasty expressly acknowledged that REG and Allied had not reached an agreement:

Per our discussion, here's our TIN (27-0809315) and is intended for the use of [REG]'s initial bid submittal on the WA DES RFP *in the event Allied and REG do not reach an agreement All[ied] reserves the right to withdraw that from our REG's* [sic] *proposal.*

(Emphasis added.)

Accordingly, Allied Fuels' argument is without merit.

---

the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages.

Ross v. Kirner, 162 Wn.2d 493, 499, 172 P.3d 701 (2007).

Allied Fuels asserts that, in reliance on false information provided by REG, Hasty "made significant changes to his business model,"[11] which included, among other things, the cancellation of fuel distribution contracts with Costco and Safeway. The basis of Allied Fuels' negligent misrepresentation claim against REG is not entirely clear. First, Allied Fuels asserts that "the parties reached agreement on the material terms of the contract and REG through its representative continued to falsely imply that the agreement had [not] been reached."[12] As already explained, there is no indication in the record that an agreement had been reached between Allied Fuels and REG. Accordingly, this argument is without merit.

Second, Allied Fuels contends that "Ellis purposely continued to provide false and misleading information to Hasty that REG would sign the contract between REG and Allied."[13] However, "a false representation as to a *presently existing* fact is a prerequisite to a misrepresentation claim." Donald B. Murphy Contractors, Inc. v. King County, 112 Wn. App. 192, 197, 49 P.3d 912 (2002) (emphasis added). Thus, any promise made by Ellis to Hasty that REG would in the future sign a contract with Allied Fuels was not a false representation of a presently existing fact.

---

[11] Br. of Appellant at 15.
[12] Br. of Appellant at 10.
[13] Br. of Appellant at 14.

18

In any event, because no master contract was entered into between REG and the Department, Allied Fuels fails to establish a fact issue concerning how it was damaged by Ellis not signing any agreement with Allied Fuels.

Accordingly, the trial court did not err by granting summary judgment on this claim.

IV

Allied Fuels also asserts that the trial court erred by denying in part its motion to amend the first amended complaint. In this motion, Allied Fuels sought to allege a claim of negligent misrepresentation against the Department. However, Allied Fuels did not designate in its notice of appeal the trial court's order denying in part its motion to amend the first amended complaint. See RAP 2.4 (requiring such a designation). "We will review a trial court order not designated in the notice of appeal if that order *prejudicially affects* the decision designated in the notice and is entered before the appellate court accepts review." Hwang v. McMahill, 103 Wn. App. 945, 949, 15 P.3d 172 (2000) (emphasis added) (citing RAP 2.4(b)). Because the trial court's order on the motion to amend was entered *after* each of the orders that were designated in the notice of appeal, that order did not prejudice any of these designated orders.[14] See Adkins v. Alum. Co. of Am., 110 Wn.2d 128, 134, 750 P.2d 1257,

---

[14] In its notice of appeal, Allied fuels designated the following four orders: (1) the order granting in part and denying in part REG's motion to dismiss, entered June 2, 2020, (2) the order granting in part and denying in part the Department's motion to dismiss, entered June 2, 2020, (3) the order granting in part and denying in part REG's motion for summary judgment, entered March 4, 2021, and (4) the order granting the Department's motion for summary judgment, entered March 4, 2021. The trial court's order denying in part the motion to amend the first amended complaint was entered on April 21, 2021.

756 P.2d 142 (1988) (stating that RAP 2.4(b) was adopted to account for "*prior appealable orders*" (emphasis added)).

Therefore, we decline to review this assignment of error.

V

Allied Fuels next contends that a genuine issue of material fact exists with regard to its WLAD claim against REG. Again, we disagree.

Allied Fuels cites to both RCW 49.60.030 and Marquis v. City of Spokane, 130 Wn.2d 97, 922 P.2d 43 (1996), in support of its argument that REG illegally discriminated against Allied Fuels. The issue in Marquis was "whether an independent contractor who is discriminated against [on the basis of sex] in the negotiation and performance of a contract for services has a cause of action for discrimination under RCW 49.60, Washington's law against discrimination." 130 Wn.2d at 100. Our Supreme Court held that "under the broad protections of RCW 49.60.030, an *independent contractor* may bring an action for discrimination in the making or performance of [a] contract for personal services where the alleged discrimination is based on sex, race, creed, color, national origin or disability." Marquis, 130 Wn.2d at 100-01 (emphasis added). The court explained the elements that must be met in order to advance such a claim:

> [I]n an action for discrimination in the making and performance of an employment contract, the plaintiff in a sex discrimination case must show (1) membership in a protected class; (2) the plaintiff was *similarly situated* to members of the opposite sex, i.e., that he or she was qualified for the position applied for or was performing *substantially equal work*; (3) *because of* plaintiff's sex he or she was *treated differently* than members of the opposite sex, i.e., that he or she was denied the position, was offered a contract only on terms which made the performance of the job more onerous or less lucrative than contracts given to members of the opposite sex, or,

once offered the contract, was treated in a manner that made the performance of the work more difficult than that of members of the opposite sex who were similarly situated.

Marquis, 130 Wn.2d at 113-14 (emphasis added).

Allied Fuels contends that a genuine issue of material fact exists with regard to its WLAD claim against REG because (1) Hasty is a member of a protected class,[15] (2) Allied Fuels was similarly situated to two other entities—Verde Energy and Star Oilco—with whom REG negotiated, (3) Allied Fuels was treated differently than Verde Energy and Star Oilco because Ellis "did not approach either Verde or Star Oil with a request that they lower their price as he did with Allied,"[16] and (4) Allied Fuels was damaged because a master contract was ultimately not entered into between REG and the Department.

For several reasons, Allied Fuels does not establish the existence of a genuine issue of material fact on this claim. First, Allied Fuels was not similarly situated to Verde Energy or Star Oilco.[17] "Similarly situated employees must have the same supervisor, be subject to the same standards, and have engaged in the same conduct." Kirby v. City of Tacoma, 124 Wn. App. 454, 475 n.16, 98 P.3d 827 (2004) (citing Vasquez v. County of Los Angeles, 349 F.3d 634, 641 n.17 (9th Cir. 2003)). Put differently, "individuals are similarly situated when they have similar jobs and display similar conduct." Vasquez, 349 F.3d at 641.[18]

---

[15] Hasty is Black. Therefore, he is a member of a protected class. RCW 49.60.030(1).

[16] Br. of Appellant at 31.

[17] In its bid submission to the Department, REG stated that Verde Energy was a female owned business and that Star Oilco was a veteran owned business. The only business that was listed as a minority owned business was Allied Fuels.

[18] "Because RCW 49.60 substantially parallels the provisions of Title VII, Washington courts look to federal law in construing RCW 49.60." Russell v. Dep't of Human Rights, 70 Wn. App. 408, 415, 854 P.2d 1087 (1993) (analyzing the Civil Rights Act of 1964, Title VII, 42 U.S.C. §§ 2000e to 2000e-17 to interpret chapter 49.60 RCW).

Here, unlike Allied Fuels, Verde Energy and Star Oilco agreed to provide fuel distribution services in the event that REG was awarded the primary contract. These services were materially different from the services that Allied Fuels proposed to provide. Therefore, Allied Fuels was not similarly situated to Verde Energy or Star Oilco.

Next, Allied Fuels fails to demonstrate how REG damaged Allied Fuels. At oral argument, counsel for Allied Fuels asserted that Allied Fuels was damaged because the master contract was ultimately not entered into between REG and the Department.[19] However, Allied Fuels fails to explain how, exactly, REG's treatment of Allied Fuels *caused* the Department to cancel the procurement of the master contract.[20]

In any event, any damage resulting from the Department cancelling the procurement of the master contract harmed both Verde Energy and Star Oilco to the same degree that Allied Fuels claims it was harmed. Indeed, because no master contract was formed, both Verde Energy and Star Oilco—just like Allied Fuels—did not receive any benefit from being subcontractors under the master

---

[19] In particular, counsel for Allied Fuels stated that REG's conduct "damaged [Allied Fuels] because [REG's conduct] then leads to a situation where, in September of 2018, REG and DES go from, 'We're going to have an interested meeting the next day' to within 24 hours we go to zero termination, the contract is gone." Wash. Court of Appeals oral argument, Allied Fuels v. State, No. 82494-5 (Apr. 20, 2022), at 3 min., 49 sec. to 4 min., 5 sec.

[20] RCW 49.60.030(2) enumerates the remedies available to a prevailing party under chapter 49.60 RCW, including the recovery of actual damages, costs, and reasonable attorney fees. "Actual damages are 'a remedy for full compensatory damages, excluding only nominal, exemplary or punitive damages,' that are '*proximately caused* by the wrongful action, resulting directly from the violation of RCW 49.60.'" Blaney v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 160, 151 Wn.2d 203, 216, 87 P.3d 757 (2004) (emphasis added) (citation omitted) (quoting Martini v. Boeing Co., 137 Wn.2d 357, 368, 371, 971 P.2d 45 (1999)).

contract. In this sense, Allied Fuels was not treated any differently than were Verde Energy or Star Oilco.[21]

Allied Fuels assignment of error fails.

VI

Finally, Allied Fuels asserts that a genuine issue of material fact exists with regard to its WLAD claim against the Department. Again, we disagree.

The basis of Allied Fuels' WLAD claim against the Department rests on a comment made by Director Liu at a meeting with Hasty. While Hasty was in the process of negotiating the terms of an agreement with REG, he scheduled a meeting with Director Liu and congressional aide Entenman. At the meeting, Hasty expressed displeasure with the fact that Ellis approached Hasty about reducing the percentage that Allied Fuels was to receive under any master contract. In a deposition, Hasty testified that Director Liu responded to Hasty by stating, "Well, you know, based on the size of your company, you know, you really should just be happy with 1 percent." According to a declaration of Hasty, he "took this comment as a direct racial comment given that Allied at least at the time was the only fuel distribution company owned by a Black man in the entire State of Washington."

---

[21] At oral argument, counsel for REG asserted that RCW 49.60.030 does not apply to protect business entities but, rather, applies to protect only individuals. Thus, REG claims, Allied Fuels lacks standing to assert a WLAD claim. Moreover, REG asserts that because Hasty was offering Allied Fuels' services, not his personal services, Hasty also does not have a claim available. In support of this argument, counsel for REG relied upon a footnote contained within its response brief. While these contentions may have merit, it has long been clear that we need not entertain issues raised or argued only in a footnote. See State v. N.E., 70 Wn. App. 602, 606 n.3, 854 P.2d 672 (1993) (arguments in footnotes need not be considered); State v. Johnson, 69 Wn. App. 189, 194 n.4, 847 P.2d 960 (1993) (argument raised in footnote will not be addressed).

Allied Fuels asserts that, based on this comment, the Department "failed to treat Plaintiffs in a manner consistent with similarly situated businesses not a member of the same protected class of Plaintiffs."[22] During oral argument, counsel for Allied Fuels stated that Hasty was "a subcontractor trying to form a contract and he was discriminated against in forming that subcontract because of his ethnicity."[23] As with its WLAD claim against REG, Allied Fuels cites to both Marquis, 130 Wn.2d 97, and RCW 49.60.030 in support of its claim against the Department.

For several reasons, Allied Fuels fails to establish an entitlement to relief on this claim. First, as already explained, Allied Fuels was not similarly situated to Verde Energy or Star Oilco. Second, the Department cancelled the procurement of the master contract. Thus, neither Verde Energy nor Star Oilco were awarded any portion of a master contract. Therefore, Allied Fuels was not denied any benefit received by Verde Energy or Star Oilco from the Department. To the contrary, all three entities ended up in the same position. In addition, there is no indication that the Department cancelled the procurement of the master contract because of REG's potential contractual relationship with Allied Fuels. Instead, the record indicates that the Department solicited and encouraged Allied Fuels to establish a business relationship with REG. Finally, the record indicates that the reason the procurement of the master contract was

---

[22] Br. of Appellant at 30.
[23] Wash. Court of Appeals oral argument, Allied Fuels v. State, No. 82494-5 (Apr. 20, 2022), at 8 min., 1 sec. to 8 min., 11 sec.

cancelled was because the cost of fuel under the proposal turned out to be far more expensive than maintaining the status quo.

Accordingly, the trial court did not err.

Affirmed.

Dwyer, J.

WE CONCUR:

Andrus, C.J.          Mann, J.